# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

LeROY A. GLAZER,

         **Plaintiff,**

    **v.**                               **Case No. 05-C-130**

EUGENE J. BROOKHOUSE,
EUGENE J. BROOKHOUSE, S.C.,
WILLIAM K. RICHARDSON,
FRANK PARISE,
and BROOKHOUSE, RICHARDSON, and PARISE,
Attorneys at Law,

         **Defendants.**

---

## DECISION AND ORDER

---

This action arises out of the March 2002 amendment of a trust known as the Dorothy M. Ruffalo Revokable Trust ("Trust"). Plaintiff LeRoy Glazer ("Glazer"), was the sole beneficiary of the Trust established by his mother Dorothy M. Ruffalo ("Ruffalo"). As his first cause of action, Glazer claims that Ruffalo's attorney, Eugene J. Brookhouse ("Brookhouse"), negligently amended the Trust on March 13, 2002, by changing the beneficiary designation to make Glazer an equal co-beneficiary with Ruffalo's nephews, Larry Senkbeil and Terry Senkbeil (collectively "Senkbeils"). As his second cause of action, Glazer

claims that Brookhouse entered into an attorney-client relationship with him and that Brookhouse breached the duties owed to him in that capacity. (Am. Compl. ¶ 23.)[1]

Jurisdiction is predicated upon 28 U.S.C. § 1332 because Glazer is a citizen of California and the Defendants, Brookhouse, Eugene J. Brookhouse, S.C. ("Brookhouse, S.C."), William K. Richardson ("Richardson"), Frank Parise ("Parise"), and Brookhouse, Richardson, and Parise, Attorneys at Law ("B R & P") are citizens of Wisconsin and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue in this district is based on 28 U.S.C. § 1391(a)(2).

The matter was tried to the Court from July 9, through July 12, 2007. The parties submitted post-trial briefs. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court sets forth its findings of fact and conclusions of law.

To give context to the March 2002, Trust amendment, extensive testimony was presented at trial regarding the persona of Ruffalo and her relationships with others including Glazer. The parties presented evidence of Ruffalo's medical condition, including excerpts from the deposition testimony of Scott Feldy, D.O. ("Feldy") and Dr. Ashok K. Shah, M.D.

---

[1]In his amended complaint, Glazer alleges that the Defendants, through Brookhouse, entered into an attorney-client relationship as a Trustee of the Trust **and** personally as a beneficiary of the Trust prior to its March 2002 amendment and that allowing amendment of the Trust breached those duties. However, in his response to paragraph two of the proposed findings of fact filed by Andrew R. Brookhouse ("Andrew"), Glazer indicated that the second cause of action alleges that Brookhouse entered into an attorney-client relationship with Glazer as the Trustee of the Trust and that Brookhouse breached the duties owed to Glazer in that capacity. (Andrew is Brookhouse's father).

In its decision on Andrew's summary judgment motion and a subsequent decision on motions in limine, the Court described the claim relying upon Glazer's description in his response to Andrew's proposed findings of fact , rather than the broader allegations of the amended complaint. *See Glazer v. Brookhouse*, 471 F. Supp. 945, 947 (E.D. Wis. 2007); *Glazer v. Brookhouse*, No. 05-C-130, 2007 WL 543454*1 (E.D. Wis. Feb. 16, 2007). However, the broader allegations of the amended complaint define the claim.

In referring to Brookhouse's father as Andrew, the Court has departed from its usual practice of referring to all individuals by their surnames because this action involves related individuals who have the same surnames. To differentiate between individuals with the same surname, after referring to one individual by their surname, the Court has referred to all others with the same surname by their given name. No disrespect is intended.

2

("Shah"). The parties also presented expert legal testimony on an attorney's duty of care in assessing a testator's competency from Randy S. Nelson ("Nelson") and Barbara J. Becker ("Becker"), and expert medical testimony of Thomas M. Naughton, M.D. ("Naughton").

### Findings of Fact

The evidence at trial disclosed the following. Ruffalo's persona was mercurial, and in part caused a fractured and tumultuous relationship to exist between her and Glazer. Ruffalo could be nice. She could be ornery. She could be anywhere in between. On the other hand, some people, despite their repeated contacts with Ruffalo, did not encounter difficulties in their relationships with her.

Ruffalo was born on August 9, 1917, and died on October 9, 2002. She had one child, Glazer, born in 1938. Ruffalo and her first husband divorced early in Glazer's childhood and they had joint custody of Glazer. Glazer's father died when Glazer was 12 years old. Glazer was raised, in large part, by his grandparents.

In 1948, Ruffalo married Elmer J. Ruffalo ("Elmer"). Elmer, Glazer's stepfather, an alcoholic, assaulted Glazer and Ruffalo and was charged with that offense. As an aftermath of that incident, Glazer ran away in 1950 to California. Ruffalo remained married to Elmer until he died in November 1993, after a long illness.

Glazer and Ruffalo had no contact between 1950 and 1994. Glazer considers Ruffalo a difficult person who never changed and had a tendency to alienate people. Glazer had three children by his first marriage. He is married to Diane Glazer ("Diane"), his second

wife. Glazer and Diane have two children of their own. Diane was employed by Glazer as a babysitter for his children during his first marriage.

Brookhouse, a graduate of the University of Wisconsin-Madison law school, worked as a law clerk for United States District Judge James Doyle for a year before joining his father, Andrew, in his practice. Brookhouse has been an attorney licensed to practice law in Wisconsin since 1970 and has engaged in the general practice of law. His practice has emphasized probate and estate planning, but he is not an expert in the field.

Prior to 1994 and thereafter, Brookhouse communicated with clients, including Ruffalo, using a letterhead identifying the name of his law firm as "Brookhouse & Brookhouse" and listing the members of the law firm as Andrew Brookhouse S.C., Brookhouse S.C., and Richardson. From 1999 through at least May 2002, the Defendants represented themselves to clients, including Ruffalo, using a letterhead identifying the name of the law firm as B, R & P and listing Andrew, Brookhouse, S.C., Richardson, and Parise beneath the firm name. At all times material to this action, Brookhouse practiced law in the firm known as B R & P with Parise and Richardson. Brookhouse S.C. is a service corporation.

On May 11, 1993, Ruffalo purchased an annuity for $60,000 from Paul R. Pulera ("Pulera"), a financial planning consultant, who lives and works in Kenosha, Wisconsin. (*See* Ex. 1010.) Ruffalo was also a personal friend of Pulera and his wife. Ruffalo was a client of the beauty shop owed by Pulera's wife. Pulera did favors for Ruffalo and when Ruffalo became a client of Brookhouse, Pulera drove Ruffalo to Brookhouse's office.

4

Initially, Ruffalo named the Senkbeils, who lived in Sheboygan, Wisconsin, as beneficiaries of the annuity. In making this designation, Ruffalo informed Pulera that she was fond of her nephews and wanted to leave them something. Pulera never heard Ruffalo speak ill of the Senkbeils.

However, over time, with Pulera's assistance, Ruffalo executed multiple change of beneficiary forms for the annuity. Sometimes, Ruffalo changed the annuity beneficiary when she became angry at the designated beneficiary or beneficiaries. Sometimes, other reasons motivated Ruffalo to change the beneficiary designation.

For example, in early July 1993, her attorney, Robert D. Zapf ("Zapf') wrote a letter to Pulera indicating that he had drafted Ruffalo's will and she wanted to establish a special needs trust for Elmer, if he survived her, and to fund it with the annuity. Ruffalo had authorized Zapf to request an amendment to the beneficiary designation so that the funds would go to the special needs trust if she predeceased Elmer. However, if Elmer did not survive Ruffalo, then the Senkbeils were to receive the annuity proceeds as equal beneficiaries.

In the wake of Elmer's November 6, 1993, death, Ruffalo executed a December 16, 1993, application for a change of the beneficiary for the annuity, designating Frank and Cathy Ruffolo (collectively the "Ruffolos") – friends (not relatives despite the similar surname) – as primary beneficiaries, and Alisa Ruffolo ("Alisa") – another friend – of the same address as the Ruffolos, as the contingent beneficiary.

In 1994, Glazer reestablished contact with Ruffalo. On July 11, 1994, Ruffalo executed an application for a change of the annuity beneficiary designating Glazer as the principal beneficiary and her grandson, Richard Glazer ("Richard"), as the contingent beneficiary.

On July 14, 1994, Brookhouse was retained by Ruffalo to provide estate planning services. (Ex. 1009.) Ruffalo described three assets to Brookhouse: her house located at 1707 40th Street, Kenosha, Wisconsin; a $90,000 annuity; and her $50,000 savings account. Ruffalo disclosed that, because of their recent reconciliation, Ruffalo wanted to make provisions for Glazer in her estate plan. Estate tax avoidance was not an issue since Ruffalo's estate was less than the threshold taxable estate of $600,000. Brookhouse outlined Ruffalo's options: 1) a will with Glazer as the primary beneficiary; 2) a trust with Glazer as the primary beneficiary; 3) the divestiture of her house so that after three years that asset would no longer count for purposes of Medicare eligibility; or, 4) a combination of the three options. Ruffalo did not want to place her house out of her control. She also said that she was never going to a nursing home so divestiture was not an issue. Ruffalo decided to have Brookhouse prepare a living trust for her, with herself as trustee, along with a pour-over will to minimize the costs of probate.

On August 2, 1994, Ruffalo executed estate planning documents including a power of attorney, a health care power of attorney, the living Trust, and a will. The August 2, 1994, Trust document provided that the primary beneficiary of the Trust was Glazer, and that $10,000 was to be distributed from the Trust to the Ruffolos upon Ruffalo's death.

6

Ruffalo transferred her home and personal property to the Trust, and designated the Trust as the beneficiary of the annuity. Glazer was vested with the power of attorney, with Pulera as an alternate. The same designations were made for Ruffalo's health care power of attorney. Pulera was present for the entire signing conference.

Less than a month later, on August 29, 1994, Ruffalo called Brookhouse from Pulera's office requesting that Brookhouse eliminate the Ruffolos as Trust beneficiaries. The amendment documents were prepared by Brookhouse on August 31, 1994.

In 1995, Ruffalo visited Glazer and his family at their home in Granite Bay, California, located near the City of Roseville, California.[2] The visit was marred by an altercation between Ruffalo and Diane. After Ruffalo returned to Kenosha, Glazer telephoned Pulera and told him never to allow Ruffalo to visit him again.

On May 15, 1995, Ruffalo met with Brookhouse to request major changes in her Trust. Ruffalo explained her reasoning for the request, indicating that a year earlier, when Glazer renewed contact with her, he visited with her for only two days, while visiting his uncle in northern Wisconsin for an entire week. Ruffalo stated that since that time, she had telephone conversations with Glazer. She stated that Glazer, who has neck and back problems, was crabby during those conversations. Ruffalo also stated that Diane, whom Glazer had employed as a babysitter prior to marrying her, got angry with her and complained that Ruffalo called Glazer too frequently. (Ruffalo also indicated that Glazer had a total of five children

---

[2]Roseville is considered part of the metropolitan area of Sacramento, California. *Roseville, California*, http://en.wikipedia.org/wiki/Roseville,_California (last visited December 13, 2007). Granite Bay is a primarily residential, upscale suburb of Sacramento located just east of Roseville. *Granite Bay, California*, http://en.wikipedia.org/wiki/Granite_Bay,_California (last visited December 13, 2007).

– he and Diane had two children.) Ruffalo also related that during her visit to California, Diane had yelled at her and Glazer did not intervene on her behalf.

Ruffalo stated that she wanted to designate Pulera as a Trust beneficiary. Brookhouse told Ruffalo that one does not make a person a beneficiary simply because that person treated one nicely. Pulera also discouraged Ruffalo from naming him as a beneficiary, suggesting that she choose his children instead. Brookhouse advised Ruffalo that she could set up a trust for the education of Pulera's children and have the remainder distributed to them. Alternatively, Brookhouse advised Ruffalo that she could leave part of the Trust to Pulera's children and part of it to her grandchildren. Ruffalo told Brookhouse that she wanted Glazer removed from her power of attorney, her health care power of attorney, and the certificate of Trust. Ruffalo directed that Glazer was not to be notified of the changes.

On May 23, 1995, Ruffalo met again with Brookhouse and reaffirmed that she wanted to change her Trust because Glazer and Diane were nasty. She decided that half of the Trust proceeds should be divided equally between her grandchildren and half of the Trust proceeds allocated for the education of Pulera's children. Ruffalo told Brookhouse that she loved her son and would love him until his death but no one would treat her like he had. Brookhouse told Ruffalo that she could change the Trust at any time. The Trust document was redrafted with Ruffalo as the trustee and Pulera as the successor trustee. When Ruffalo made the changes, Brookhouse was confident that Ruffalo had testamentary capacity.

After Ruffalo designated Pulera as having her power of attorney, Ruffalo acted as if she owned Pulera and became very demanding. As one example, she burst into Pulera's

8

office when he had clients. In 1999, because of Ruffalo's demanding behavior, Pulera severed both his professional and personal ties with her. Pulera viewed Ruffalo as a person who knew what she had and what she wanted to do.

In 1999, Ruffalo advised Brookhouse that she wanted to make changes to remove the Pulera children as Trust beneficiaries and Pulera as her power of attorney, and to reinstate Glazer. Brookhouse recalls Ruffalo making the changes because she believed she had received bad investment advice from Pulera. Brookhouse assessed Ruffalo's testamentary capacity at that time. Finding her to have testamentary capacity, Brookhouse prepared documents to effect the changes.

On May 19, 1999, Ruffalo executed a general durable power of attorney and health care power of attorney appointing Glazer in those capacities. (Exs. 3 & 4.) The documents indicated a Roseville, California address for Glazer. Ruffalo also executed a reconstituted and restated Trust agreement designating herself as the trustee, Glazer as her successor trustee, and her grandson, Richard, as Glazer's successor trustee. (Ex. 5.)

At Ruffalo's direction, by letter dated May 21, 1999, Brookhouse advised Pulera that Ruffalo had recently changed her Trust and powers of attorney. In the letter, Brookhouse requested that Pulera provide information about the annuity to Brookhouse or to Ruffalo, directly.

Pulera responded by a letter dated May 25, 1999, stating in part:

> My wife and I are very pleased that [Ruffalo] has decided to remove my name as her power of attorney. To say that it was a mistake for me to try to help her would be a huge understatement. [Ruffalo] has a very volatile personality and has created very

9

> unpleasant scenes in my wife's beauty shop, doctor's offices and
> restaurants. We have suggested to her on many occasions to get
> help and/or move into a nursing home or assisted care facility.

(*See* Ex. 1009.) Pulera also wrote: "I will not personally have any contact with [Ruffalo], so if she has any questions about her annuity, I would appreciate it if the questions came through your office." (*Id.*)

The evidence discloses that in 2000, Ruffalo experienced some medical problems. From September 17 through September 22, 2000, Ruffalo was hospitalized by Dr. Stephen Murray ("Murray") at the Kenosha Hospital for evaluation of rectal bleeding and other medical complaints. (Ex. 1000). On September 18, 2000, Ruffalo underwent a psychiatric evaluation by Shah, a board-certified psychiatrist, because of suicidal ideation and probable cerebral encephalopathy[3], possible Alzheimer's disease. (*Id.* at LG 0661; Ex. 33.) Shah's diagnostic impression was a history of dystrophy[4] in the frontal brain according to the records and possible dementia[5] with significant uncooperativeness and noncompliance with treatment. (Ex. 1001 at LG 0647.) Shah concluded that Ruffalo was showing evidence of personality exacerbation and organic personality syndrome.[6] (*Id.*)

---

[3]Encephalopathy is defined as "any disorder of the brain." *Stedman's Medical Dictionary* 636 (28th ed. 2006).

[4]Dystrophy is defined as "progressive changes that may result from defective nutrition of a tissue or organ." *Id.* at 602.

[5]Dementia is defined as "the loss, usually progressive, of cognitive and intellectual functions, without impairment of perception or consciousness; caused by a variety of disorders (structural or degenerative), but most commonly associated with structural brain disease. Characterized by disorientation, impaired memory, judgment, and intellect, and a shallow labile affect." *Id.* at 508.

[6]"Organic personality syndrome" is defined as "chronic, mild states of memory disturbance and intellectual deterioration, of nonpsychotic nature, often accompanied by increased irritability, querulousness, lassitude, and complaints of physical weakness. These states are often associated with old age, and may precede more severe states due to brain damage classifiable under senile or presenile dementia, dementia associated with other chronic organic

10

On September 22, 2000, when Ruffalo was advised that her physicians recommended that she be discharged from the hospital, she became very upset and screamed at the nurse and other staff that she was going to shoot herself. (*Id.* at LG 0662.) Murray and Shah were notified, and Ruffalo was transported by the police to the Racine Inpatient Psychiatric Hospital St. Luke ("St. Luke's"), pursuant to the involuntary commitment procedures of Chapter 51 of the Wisconsin Statutes. (*Id.*; Ex. 34 (Excerpts of Jan. 16, 2007, Shah Dep.) at 2.)

Ruffalo was hospitalized at St. Luke's from September 22, through September 30, 2000, with Shah as her treating psychiatrist. (Ex. 1001.) Psychological test results were not consistent with dementia. A September 27, 2000, patient progress record entry states that Ruffalo's test performance was "significantly better than an average 83 year old. Her performance on the geriatric depression scale indicated a moderate amount of depression." (*Id.*) Ruffalo was discharged to her home without any psychotropic medication.

Ruffalo was first seen at Feldy's office on August 1, 2001. (Ex. 1002.) Medical records from Feldy's office indicate that Ruffalo presented multiple problems and was a difficult patient. On August 29, 2001, Feldy noted that "[a]pparently, she has been banned from the Kenosha Hospital Clinic due to abusive behavior." (*Id.* at LG 1491.) He also noted Ruffalo had "a history of belligerent behavior, which is well-documented in previous notes, but today is well-behaved." (*Id.*)

---

psychotic brain syndromes, or delirium, delusions, hallucinosis, and depression in transient organic psychotic conditions." *Mental Disorders in the International Classification of Diseases*, Ch. 5 (9th rev. 2006) http://ftp.cdc.gov/pub/health_statistics/NCHS/Publications/ICD9-CM/1996/DISEASES/TABULAR/append_b.rtf. (last visited December 13, 2007).

On September 30, 2001, Ruffalo was seen at the Kenosha Hospital emergency room for complaints of a headache and dizziness. (Ex. 1003.) She reported that she had frequent falls but stated that she had not fallen for two days. (*Id.*) Ruffalo was treated and the emergency room physician felt that she could be released to go home since the headaches and dizziness appeared, by her history, to be chronic. (*Id.*) However, Ruffalo objected, indicating that she felt unsafe to go home because she lived alone and had frequent falls. (*Id.*) Ruffalo was admitted to the hospital and remained hospitalized from September 30, until October 3, 2001, when she was discharged in stable condition. Her physician was Feldy. The discharge diagnosis included organic brain syndrome.[7]

On October 7, 2001, Ruffalo was re-admitted to Kenosha Hospital from the emergency room due to complaints of chest pain. (Ex. 1004.) Feldy discharged her on October 10, 2001, with diagnoses that included noncardiac chest pain, a psychiatric disorder, possible paranoid schizophrenia, and mild dementia. Following Ruffalo's discharge, Feldy arranged to have a nurse from the Kenosha Visiting Nurse Association visit her for three weeks.

On January 19, 2002, Ruffalo was found lying on the floor of her home following a fall and was taken to Kenosha Hospital by Rescue Squad. (Ex. 1007.) She had either experienced a syncopal[8] event or a fall. Ruffalo had abrasions on her cheeks and

---

[7]"Organic brain syndrome" ("OBS") is "a general term, referring to physical disorders (usually not psychiatric disorders) that cause decreased mental function." Medline Plus, *Medical Encyclopedia, Organic Brain Syndrome* http://www.nlm.nih.gov/medlineplus/ency/article/001401.htm (last visited December 13, 2007).

[8]Syncopal is defined as "relating to a loss of consciousness and postural tone caused by diminished cerebral blood flow." *Stedman's Medical Dictionary*, *supra* note 3, at 1887.

forehead, and mid to low back, and fairly severe abrasions around her knees. Ruffalo was alert but also was confused at times. Ruffalo was diagnosed with acute rhabdomyolysis[9] and dehydration. Feldy noted that about eight months earlier he "became active in her care after emergency room physicians at KMH refused to see her any longer." (*Id.* at LG 0799.)

Feldy obtained Ruffalo's history from Glazer and her neighbor because Ruffalo did not remember the recent events. Feldy's notes state that he spent "quite some time talking with Glazer" that day. (*Id.* at LG 0880.) Glazer reported talking to Ruffalo daily or every other day. Glazer told Feldy that he had Ruffalo's durable power of attorney for health care. He also related that he had taken Ruffalo to California but that he could not live with her. Ruffalo was too agitated, constantly argued with Diane, and wanted to return to Kenosha.

Feldy admitted Ruffalo to telemetry and for rehydration. Feldy also decided to have Ruffalo's health care power of attorney activated.

On January 22, 2002, Shah conducted a consultative examination of Ruffalo to evaluate her capacity to make medical decisions. Shah noted that Ruffalo "does . . . remember exactly what brought her into the hospital." (*Id.* at LG 0810.) However, Shah also reported that she thought the day was a Saturday, but it was a Tuesday. Shah also noted that Ruffalo did not remember him, although he had seen her many times. Shah observed that Ruffalo was groggy and drowsy, unsteady on her feet, and her mood was irritable to blunt. Her affect was irritable when discussing nursing home placement and she became loud, suspicious, and angry.

---

[9]Rhabdomyolysis is defined as" an acute, fulminating, potentially fatal disease of skeletal muscle that entails destruction of muscle." *Id.* at 1699.

Shah stated that there was "some paranoia present are chronic in nature and no other psychotic symptoms." (*Id.* at LG 0811.) Shah's diagnostic impression was "organic personality disorder[10] with chronic paranoia[11] and personality disorder with noncompliance." (*Id.*) Shah found that Ruffalo showed "evidence of memory impairment," which with organic brain syndrome, may be related to her current medical conditions (dehydration and rhabdomyolysis). He stated that "in view of her current behavior, her memory impairment, [he did] not think she was capable of taking care of herself and would declare her incompetent." *Id.* Shah did not repeat any of the testing that he had performed at St. Luke's because Ruffalo "was obviously clinically not capable of making decisions." (Ex. 34 at 7.)

On January 22, 2002, Feldy and Shah each executed a physician's statement of incapacity finding that Ruffalo "has a condition that renders the individual unable to receive and evaluate information effectively or to communicate decisions to such an extent that he/she lacks the capacity to manage his/her health care decisions." (Ex. 11.) These statements of incapacity remained in effect throughout the rest of Ruffalo's life. Shah has "no idea" of whether Ruffalo improved in any way over the next several months because he "was not in touch with her." (Ex. 34 at 7.)

---

[10]"Organic personality disorder" is a term which was used in the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-III-R. *See Healthier You*, *Organic Personality Disorder*, http://www.healthieryou.com /mhexpert/exp1042803a.html (last visited December 13, 2007). In the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-IV-TR (4th ed. 2000), the condition is termed "Personality Change Due to a General Medical Condition," and defined as "a persistent personality disturbance that is judged to be due to the direct physiological effects of a general medical condition. The personality disturbance represents a change from the individual's previous characteristic personality pattern." *See Healthier You*, *Organic Personality Disorder*, http://www.healthieryou.com /mhexpert/exp1042803a.html (last visited December 13, 2007) (quoting *Diagnostic and Statistical Manual of Mental Disorders*, DSM-IV-TR at 171).

[11]Paranoia is defined as "a severe but relatively rare mental disorder characterized by the presence of systematized delusions, often of a persecutory character involving being followed, poisoned, or harmed by other means, in an otherwise intact personality." *See Stedman's Medical Dictionary*, *supra* note 3, at 1421.

On January 25, 2002, Ruffalo was discharged to the Hospitality Manor Nursing Home ("Hospitality Manor"). Shah did not see Ruffalo after her discharge from the hospital.

A January 25, 2002, social service assessment completed by Hospitality Manor social services employee, Jan Walczak, reported that Ruffalo's orientation as to persons fluctuated, and that Ruffalo could communicate verbally and was able to make herself understood to others at times and could understand others at times. (Ex. 46 LG 2077.) Neither Ruffalo's long term, nor her short term, memory was intact. (*Id.*) Ruffalo's mood/behavior had deteriorated within the preceding six months and her cognitive skills and daily decision making were severely impaired. (*Id.*) Her cognitive status had also deteriorated within the preceding six months as indicated by the activation of her power of attorney while she was hospitalized. (*Id.*)

A dementia functional assessment completed on January 29, 2002, indicates that Ruffalo had three areas of severe cognitive decline in that she was unable to recall most recent events, was repetitive, and fed herself with cues or assistance. (Ex. 46.) At times, Ruffalo also had two additional areas of severe cognitive decline in the form of catastrophic reactions and great resistance to caregiving. (*Id.*) No areas of very severe cognitive decline were reported. (*Id.*)

Written assessment comments dated January 29, 2002, state that Ruffalo had a personality disorder with chronic paranoia and dementia. (Ex. 47.) She was alert and oriented times two with periods of confusion. (*Id.*) Ruffalo was reported to be easily irritated but she accepted one to one contact. (*Id.*)

Ruffalo's room was across the hall from Walczak's office. Walczak, who views herself as an advocate for the patients, saw Ruffalo almost daily for about 45 minutes. Walczak found that most of the time Ruffalo was a nice lady to be around. Ruffalo never fought with Walczak.

At the beginning, Ruffalo was difficult to deal with because she did not want to take a shower or go to therapy, and she fought with the nurses aides. Initially, Glazer directed the Hospitality Manor staff with respect to Ruffalo, but after about a month or a month and a half at the nursing home, Ruffalo took over. Ruffalo knew what she wanted to do and told the Hospitality Manor staff. Despite the medical declarations of incompetency, Ruffalo was allowed to make decisions about medications and her participation in therapy.

Walczak heard Ruffalo's side of telephone conversations with Glazer and was aware that sometimes Ruffalo and Glazer argued. Ruffalo hung up the telephone on Glazer and also told Walczak that Glazer hung up on her. Glazer visited Ruffalo once at the nursing home.

Walczak met the Senkbeils when they attended Grandparents Day at the nursing home with Ruffalo. They also telephoned Ruffalo while she was at Hospitality Manor.

After Ruffalo had been at Hospitality Manor for a time, Glazer wanted to move Ruffalo into an assisted living facility, St. James Manor ("St. James"), which would be less expensive. Glazer called Walczak and requested a list of community based residential treatment facilities ("CBRFs"), which she provided to him. At Glazer's request, personnel

16

from CBRFs came to evaluate Ruffalo. Ruffalo was adamant that she was not going to move to a CBRF.

There was a note in Ruffalo's file indicating that she had been transported to the hospital from her home on January 19, 2002. Ruffalo did not have clothing, her glasses or dentures, and insisted that she needed them. Walczak called Glazer to see how Ruffalo could get those items.

Feldy's February 12, 2002, order in the Hospitality Manor records states that Ruffalo was oriented as to person and place, but not time. (Ex. 1008 LG 1723.) He noted that Ruffalo was "doing quite well" at the nursing home and she had developed some socialization. (*Id.*) She needed supervision with her medications. (*Id.*) Indicating that Glazer, Ruffalo's power of attorney, wanted Ruffalo moved to St. James and that Ruffalo refused, Feldy recommended that Ruffalo be kept at Hospitality Manor "at least for now." (*Id.*)

A progress note dated February 21, 2002, states that Hospitality Manor received a call from St. James inquiring whether Ruffalo was going to be transferred there. (*Id.* at LG 2083.) The note states that Ruffalo had refused to leave and that if Glazer wanted Ruffalo moved he would have to come and explain the rates to her. (*Id.*) Hospitality Manor staff had tried numerous times and Ruffalo stated that she wanted to stay no matter what. (*Id.*) Glazer refused to permit Hospitality Manor personnel to pick up Ruffalo's belongings from St. James.

Thereafter, a February 25, 2002, progress note states Hospitality Manor had been notified by St. James personnel that Glazer had given permission for Ruffalo to get her

belongings, with the exceptions of her purse and the key which Glazer wanted sent to him. (*Id*. at LG 2084.)

On February 25, or 26, 2002, Brookhouse received a telephone call from Ruffalo, informing him that she wanted to deed her house to Glazer. Brookhouse understood Ruffalo's request as implicitly relating to their 1994 discussion about divestiture of her house.

Thereafter, staff at B R & P contacted Glazer to obtain his social security number to complete the forms for the transaction. On February 27, 2002, Glazer called B R & P and provided them with his social security number. (Ex. 41.)

Because Brookhouse was not available, Brookhouse tasked Richardson, who had no prior involvement with Ruffalo's file, with the responsibility of visiting Ruffalo at Hospitality Manor to enable her to execute the quit claim deed. On February 28, 2002, Richardson and Jean Miller ("Miller"), a B R & P legal assistant who assisted Brookhouse with estate planning matters, met with Ruffalo at Hospitality Manor. Richardson discussed the transaction with Ruffalo, including the effect of the deed and the transfer, and the need to maintain home insurance. Ruffalo signed the deed and the real estate transfer form.

Contemporaneous notes taken by Miller indicate that Ruffalo told Richardson that she had purchased the home in 1946; Ruffalo and Elmer had actually purchased the home in 1964 – a fact apparent from documents in Brookhouse's file. During the visit, Ruffalo questioned the accuracy of the Granite Bay, California, address for Glazer stated on the deed. Ruffalo believed that Richardson had an incorrect address for Glazer, because Glazer did not reside in Granite Bay, California. Based on Richardson's assessment of Ruffalo, he concluded

that Ruffalo was legally competent to complete the transaction. Richardson would not have allowed Ruffalo to do so if she was not competent.

On March 1, 2002, Ruffalo telephoned Richardson and informed him that she did not want the deed recorded because Glazer had lied about where he lived and he had lied to her in the past. She related that Glazer lived in Roseville, not Granite Bay, California. Ruffalo told Richardson she wanted to give her assets to the Senkbeils. Ruffalo also directed Richardson not to contact Glazer about the matter. Richardson was surprised by Ruffalo's quick change of mind and he immediately prepared a memo about it to Brookhouse. (*See* Ex. 1009.)

Brookhouse received Richardson's memo and made a March 5, 2002, appointment to see Ruffalo at the nursing home. Brookhouse called Ruffalo prior to that appointment but Brookhouse does not recall what was discussed.

On March 4, 2002, Glazer called Brookhouse because he had heard that Ruffalo was removing him from her will. Glazer asked whether the information was correct and Brookhouse told him it was. During that conversation, Glazer added Feldy to the call. Feldy advised Brookhouse that he and Shah had declared Ruffalo to be medically incompetent. Brookhouse has no independent recollection of what Feldy told him during that conversation.

The conversation between Glazer and Brookhouse continued without Feldy. Glazer told Brookhouse that he had just heard what the doctors said. Brookhouse stated that he did not care about what the doctors said, he was going to determine Glazer's competency.

19

Glazer asked Brookhouse whether he needed to obtain counsel with regard to being the beneficiary of his mother's Trust. Brookhouse told Glazer that he could represent his interests, but the decision was Glazer's.

Brookhouse met with Ruffalo in a conference room at Hospitality Manor on March 5, 2002. Ruffalo was neatly dressed. Ruffalo's first comment to Brookhouse was that she was embarrassed because she did not have her dentures. Ruffalo was calm and her emotional state remained intact. Brookhouse found Ruffalo less vigorous than when he had last seen her. He estimated that she was about a five on a ten-point scale for vigor. Her mental acuity was unchanged.

Brookhouse asked Ruffalo about her decision to rescind her directive of late February about the deed and the Trust, increasing his probing because of those changes. Ruffalo provided reasons for her decision which were similar to those she had presented in 1995. Ruffalo explained that she loved Glazer. He sent beautiful cards and money, but he had a bad temper. Ruffalo also was not pleased that Glazer had not come to see her when she was in the hospital and the nursing home.

Ruffalo explained that the Senkbeils, the twin sons of her sister Dolores, called her every Sunday, even when she was in the nursing home, and they also helped her around the house. Ruffalo provided Brookhouse with the ages and phone numbers of the Senkbeils, as well as the ages of their children. Ruffalo discussed her brother and his daughter, and her other sister and that sister's children. Ruffalo wanted the Trust proceeds to be divided in

thirds between the Senkbeils and Glazer, with Glazer as executor and the Senkbeils as the personal representatives.

Ruffalo talked to Brookhouse about her future. She wanted to go home while others wanted her to go to an assisted living facility. Ruffalo felt that Feldy would allow her to go to an assisted living facility but she wanted to wait until she could go home. Ruffalo knew that Glazer was managing her money and did not know the exact amount of money she had. Ruffalo told Brookhouse that she had a safe deposit box at Bank One in Kenosha – but she did not have a key.[12] Brookhouse thought Ruffalo was competent under the Wisconsin test for testamentary competency as set forth by *In re Estate of Sorensen*, 274 N.W.2d 694, 697 (Wis. 1979). The meeting lasted about 30 minutes.

Brookhouse's office prepared the legal documents in accordance with Ruffalo's wishes. Brookhouse made arrangements for a March 13, 2002, meeting with Ruffalo.

Feldy's March 11, 2002, order in the Hospitality Manor records indicates that Ruffalo was doing okay. (Ex. 1008 LG 1729.) Ruffalo was still occasionally agitated and occasionally exhibited inappropriate behavior. (*Id.*) Glazer wanted her placed at St. James, but Ruffalo refused. (*Id.*) Ruffalo was oriented as to person and place but not as to time. (*Id.*) Feldy recommended a psychiatric reassessment if Ruffalo wanted to re-establish her competency. (*Id.*) He noted that Ruffalo said she would check if it was okay with her lawyer. (*Id.*)

_____

[12]Ruffalo used that bank but did not have a safe deposit box there. There is no evidence that Brookhouse investigated whether Ruffalo had a safe deposit box.

Walczak's progress notes of March 11, 2002, state that she was visiting Ruffalo on a daily basis and Ruffalo was usually pleasant and cooperative, however Ruffalo could be rude and demanding at times. (Ex. 1008 LG 2086.) Walczak noted that Ruffalo had been refusing medication and meals. (*Id.*) She just wanted strawberry gelatin and strawberry Ensure. (*Id.*) Ruffalo complained about both peers and staff and was difficult to get along with. (*Id.*) Ruffalo continued to need verbal cues and reminders about changing clothes and eating more than Jello and Ensure. (*Id.*)

Nursing notes of March 11, 2002, reflect that Ruffalo refused to provide a urine sample. (Ex. 1008 LG 1922.) That evening while Ruffalo was sitting by the nursing station she started to yell at and threaten to hit another resident. (*Id.*) Ruffalo was redirected. (*Id.*)

Walczak's progress notes for March 12, 2002, record that Ruffalo told her that her physician had seen her the preceding night and that she got mad at him because he said that she should go to St. James for a while before going home. (*Id.*) Ruffalo told Walczak again and again that she did not want to go there. (*Id.*) Walczak read the doctor's note which stated that Glazer still wanted Ruffalo to go to St. James and also wanted Ruffalo to see a "psych" doctor. (*Id.*) Ruffalo was not happy about any of this. (*Id.*)

On March 13, 2002, Brookhouse and Ruffalo met in the same conference room. Also present were Tracey MacDonald ("MacDonald") of B R & P and Walczak.

Brookhouse discussed the disposition of Ruffalo's estate into thirds. Brookhouse also discussed Ruffalo deeding her home to Glazer. Ruffalo did not want to do so. Ruffalo was in the same condition as she had been eight days earlier. Ruffalo was

appropriate in her questions and answers. Ruffalo confirmed her assets – the house, the annuity, and the bank account. Brookhouse and Ruffalo talked about Ruffalo's feelings for her son and the Senkbeils. Ruffalo corrected Brookhouse when he stated that she had six grandchildren, informing him that she had five grandchildren. Ruffalo signed the first amendment to the Trust and her amended will. Brookhouse and Walczak signed as witnesses. MacDonald notarized the documents. Ruffalo asked that Brookhouse take the documents because she said it was not safe for her to keep them. The March 13, 2002, meeting lasted about 30 minutes. Brookhouse has no doubt that Ruffalo had testamentary capacity on March 13, 2002. MacDonald felt Ruffalo knew exactly what she was doing and why she was doing it.

Walczak observed that Ruffalo interacted with Brookhouse and appeared to understand the conversation. She saw Ruffalo read the documents provided by Brookhouse and thought Ruffalo appeared to understand them. Ruffalo did not show inappropriate emotion. Walczak observed that Ruffalo showed anger when she spoke about Glazer.

Walczak's progress notes for March 13, 2002, indicate that she spoke to Ruffalo and Brookhouse regarding Ruffalo's will and what she wanted to do with her home when she dies. (Ex. 1008 LG 2086.) Walczak wrote "[s]he told the lawyer exactly what she wanted and why and had told him this in the past – lawyer had papers drawn up and [Ruffalo] signed and I as a witness signed as well." (*Id.* at LG 2086-87.) On March 15, 2002, Walzcak noted that Glazer called and said that he was sending the payment for Ruffalo to stay there and that he wanted to know how Ruffalo was doing and if she was eating enough. (*Id.* at LG 2087.)

Walzcak's notes for March 21, 2002, reflect that, at Glazer's request, a representative from an Alterra Assisted Living facility came to see Ruffalo about moving to that facility. (*Id.*) Ruffalo became loud, rude, and was yelling at the representative that she was not going any where but home. The representative told Walzcak that she was sure Ruffalo knew exactly what she wanted and did not want and that she would call Ruffalo's son and let him know. (*Id.*) Walzcak's progress notes reflect that she had a discussion with Ruffalo to the effect that Glazer was sending the people from assisted living centers, not the nursing home. (*Id.* at LG 2088.) The note for March 21, 2002, also states that Ruffalo was happy that Glazer finally sent her purse to her. (*Id.*)

Walczak knew that two physicians had found Ruffalo incompetent but Walczak felt differently. Walczak wanted Ruffalo's certificate of incompetency lifted because she felt that Ruffalo knew what she wanted and Glazer was not always acting in Ruffalo's best interests. On March 21, 2002, at Walczak's request, a Hospitality Manor nurse contacted Feldy's office and requested that he lift the certificate of incompetency. (Ex. 1008 LG 2088.) Feldy's office said "no." (*Id.*) Walczak allowed Ruffalo to make healthcare decisions despite Feldy's order. Walczak's progress notes also reflect that on March 23, 2002, Ruffalo requested that Walczak change her dental appointment so that she could get her dentures back sooner. (*Id.* at LG 2089.)

On April 3, 2002, Walczak contacted the Department of Aging to find out how the certificate of incompetency could be lifted. (*Id.* at LG 2090.)

Beginning on April 8, 2002, Walczak noted that there had been a decline in Ruffalo's health status, noting hand shaking like tremors, forgetfulness, and quietness. (*Id.* at LG 2091.) This change was also documented by Jessica Ladine ("Ladine"), who also was employed in social services at Hospitality Manor.

An April 12, 2002, order from Feldy in the Hospitality Manor records indicates that she was oriented as to person, place, and time. (*Id*. at LG 1730.) Feldy noted that Ruffalo had been falling frequently. (*Id*.) She was weak and shaky, and had not been eating well. (*Id*.) Feldy directed that Ruffalo undergo a MRI (magnetic resonance imaging) to rule out a "CVA" (cerebrovascular accident)[13] or brain tumor. (*Id*.)

Further deterioration in Ruffalo's cognitive status and episodes of delirium are reflected in subsequent nursing home records completed on May 7, 2002, which unless otherwise stated reflect Ruffalo's condition over the prior seven days. (*See* Exs. 36A (LG 1565-LG 1569) & 36B (LG 1573-LG 1584); Ex. 46, Ex. 47.) A dementia functional assessment completed on May 7, 2002, indicates that Ruffalo had eight out of eleven areas of severe cognitive decline. (Ex. 46).) No areas of very severe cognitive decline were reported. (*Id.*)

Written assessment comments dated May 7, 2002, indicate that Ruffalo had "COC,"[14] her health and psychosocial mood and behavior had deteriorated. (Ex. 47.) She

---

[13]Cerebrovascular accident is an imprecise term for cerebral stroke. *See Stedman's Medical Dictionary*, *supra* note 3, at 10.

[14]Naughton was not familiar with the abbreviation "COC" and this Court's search of medical reference materials did not identify a meaning for the abbreviation that makes sense in the context of this case.

refused all out of room activity participation. (*Id.*) Ruffalo remained very accepting of one on one contact for socialization and attention. (*Id.*)

Sometime between March 4, and April 18, 2002, Glazer retained Attorney Donald Bauhs ("Bauhs"), since deceased, to represent him. Glazer testified that when he received documents from Brookhouse showing that he had a one-third interest in Ruffalo's estate he knew he was not going to get help from Brookhouse and he retained Bauhs. By letter dated April 18, 2002, signed by Glazer and Bauhs, Glazer discharged Brookhouse as attorney for Ruffalo. (Ex. 54.) The letter invokes paragraph 22 of Ruffalo's power of attorney.[15]

By letter dated May 2, 2002, Brookhouse forwarded the April 18, 2002, letter to Ruffalo. (*Id.*) Brookhouse also inquired whether Ruffalo wanted him to have her will and Trust documents which she had signed March 13, 2002, along with the balance of her file, delivered to Bauhs.

On May 7, 2002, Brookhouse received a telephone message indicating that Walczak had called to report that Ruffalo did not want a new attorney. (*Id.*) Brookhouse believes that he followed up on the phone call with Ruffalo to confirm her wishes.

On May 23, 2002, Brookhouse wrote Bauhs stating that Ruffalo was unequivocal in her response that his office should continue to represent her. (*Id.*) Thus,

---

[15]Paragraph 22 of Ruffalo's power of attorney gives Glazer the power: "To appoint, employ and dismiss from time to time, for my benefit and the administration of my property, agents, attorneys, investment advisors, accountants, housekeepers and other persons, upon such terms and for such compensation as Attorney thinks proper; to terminate any agency that I may have created any time." (Ex. 3, 4.)

Case 2:05-cv-00130-RTR   Filed 01/17/08   Page 26 of 49   Document 113

Brookhouse stated that the firm would not provide the originals of the documents requested unless advised to do so by a court.

Based on the medical opinions of Shah and Feldy that Ruffalo was incompetent, Bauhs reached the legal opinion that Ruffalo was not competent to amend the Trust. (Ex. 32 at 10-11.) Bauhs believed that it was perfectly appropriate for Glazer to take action without consulting Ruffalo because she was incompetent to communicate with Glazer regarding her assets and other actions on her behalf and Glazer was acting in her best interests. (*Id.* at 37: l. 20-38.)

Glazer, through Bauhs, sold Ruffalo's home without Ruffalo's permission and put the proceeds in a joint checking account with Ruffalo that he had opened at a Kenosha bank. Glazer also changed the beneficiary of the annuity from the Trust to himself, and disposed of the remaining assets in Ruffalo's Trust (her clothing and furniture) through donation. When Ruffalo died all her remaining assets went to Glazer.

A dementia functional assessment completed on August 5, 2002, indicates that Ruffalo had two areas of severe cognitive decline in that she was repetitive and fed herself with cues or assistance. (Ex. 46.) At times, Ruffalo also had three additional areas of severe cognitive decline in the form refusal to change her clothing, catastrophic reactions, and great resistance to caregiving. (*Id.*) No areas of very severe cognitive decline were reported. (*Id.*)

Written assessment comments of August 5, 2002, indicate that Ruffalo had some increase in spirts and not as many behavior problems. (Ex. 47.) She called people and staff names. (*Id.*) She continued to accept one on one contact for socialization. (*Id.*)

On October 1, 2002, Ruffalo signed a do not resuscitate ("DNR") order. (Ex. 1008 (last two pages (unnumbered)).) Ruffalo died on October 9, 2002.

On October 30, 2002, Brookhouse met with the Senkbeils about Ruffalo's estate. Brookhouse had learned from Bauhs that the Senkbeils would not receive the portion of Ruffalo's estate that she had intended. Because Brookhouse thought that Ruffalo had testamentary capacity and because he wanted Ruffalo's wishes to be carried out that the Senkbeils receive two-thirds of her estate, he advised the Senkbeils that they could sue Glazer. Richardson contacted another Kenosha law firm regarding the Senkbeils and prepared a demand letter for that law firm to send to Glazer. (*See* Ex. 40.)

In October 2003, the Senkbeils filed a civil action in Kenosha County Circuit Court against Glazer. (Ex. 21.) The complaint alleges that Glazer had breached his fiduciary duty as trustee of the Trust and that he had breached his fiduciary duty as attorney in fact and/or power of attorney.

Gilbert Berthelsen ("Berthelsen") of von Briesen & Roper s.c. represented Glazer in the Senkbeil action. Glazer removed the action to this federal district court. On November 9, 2004, in mediation prior to trial, before any issue could be decided, Glazer settled the Senkbeil action by paying the Senkbeils $80,000. (*See* Ex. 28.) The settlement agreement states that the settlement was a release of disputed claims and the payment was not to be considered an admission of liability and that liability was expressly denied by Glazer. (*Id.* at 2.) In defending the Senkbeil litigation, Glazer spent $77,267.24. (Ex. 29.)

28

Despite the settlement, Berthelsen was confident that Glazer could have won because of the two doctors finding that Ruffalo was incompetent. On the other hand, the Senkbeils had the "moment of lucidity" standard in their favor. Berthelsen was uncertain of a Glazer win only because of the unpredictability of juries. Berthelsen recommended settlement because of the cost of litigation, particularly if there was an appeal. Berthelsen did not have a problem with the actions Glazer took under the power of attorney. Berthelsen worked with Glazer for a year and believes that he is a fine man.

Berthelsen, an attorney with over 39 years of experience, who had a trust and estate practice for the first 30 years of his practice, believed that the opinions of Shah and Feldy as to Ruffalo's competence trumped that of Brookhouse. Under the circumstances, Berthelsen would not have allowed Ruffalo to amend the Trust as did Brookhouse. Berthelsen would have deferred to the medical determination of Ruffalo's incompetency because of his experiences with his father's Alzheimer's disease.

Becker has practiced law 30 years. Her professional accomplishments include being a cum laude graduate of Marquette University Law School ("Marquette"), serving as articles editor of the Marquette Law Review, and being named the top elder law attorney in the 2003 *Milwaukee Magazine*, "Best Lawyers" article and having been included in *Milwaukee Magazine* "Best Lawyers" articles since 1985. (*See* Ex. 1014.) Becker's legal practice is 75 to 80 percent elder law and 20 to 25 percent estate planning.

In Becker's opinion, Brookhouse acted as a reasonably prudent attorney in that he accurately determined that Ruffalo had testamentary capacity, and proceeded to accomplish

Ruffalo's wishes with regard to estate planning. (Ex. 1012, 7.) Becker cited to Brookhouse's long history with Ruffalo. (*Id.*) As a basis for her opinion, Becker indicates that although Ruffalo's personality might have been erratic, combative, and eccentric, she never lost track of who she was, who her family members were, what her assets were, and whom she wanted to those assets to go to on her death. (*Id.* at 6.) Becker also noted that Ruffalo had sufficient personal reasons for the changes she made in her will and her Trust. (*Id.*)

Additionally, Becker relied on Ruffalo's capacity to make her own choice about staying at Hospitality Manor rather than moving to the less expensive assisted living center recommended by Glazer, and to regularly consult with staff regarding administration of certain medications. (*Id.*) Becker also noted that, although physicians may have an opinion about a person's mental competence, only a Wisconsin court can find that a person is legally incompetent and that no such finding was made here. (*Id.*) Becker also stated that given the long estrangement, the troubled relationship, and Glazer's treatment of Ruffalo both before and after her admission to Hospitality Manor, it is not surprising that she reduced Glazer's share of her estate. (*Id.*)

Becker cited seventeen other facts which led to the forming of her opinion. (*Id.* at 2-5.) Those facts encompass the inception of the attorney-client relationship between Brookhouse and Ruffalo in 1994, their periodic contacts, and the estate plan changes which Ruffalo directed that Brookhouse make in late August 1994, May 1995, and 1999. (*Id.* at 2-3.) Becker also relied upon Brookhouse's knowledge of the estrangement between Glazer and

Ruffalo, their stormy relationship thereafter, and Ruffalo's explanation of the reasons for her 1995 change of beneficiaries. (*Id*.)

Becker also considered Ruffalo's January 2002, hospitalization, her dehydration and confusion, her transfer to the nursing home, and her anger at Glazer for his handling of her health care including her anger at his attempts to place her in a less expensive assisted living facility. (*Id*. at 3.) She also took into account the January 2002, declarations of Ruffalo's incompetence to make health care decisions, and Shah's diagnosis of organic personality disorder with chronic paranoia and personality disorder with noncompliance. (*Id*.) Becker considered Ruffalo's late February 2002, request for, and execution of, the deed transferring her house to Glazer, and her March 1, 2002, phone call to Richardson directing that the deed not be recorded because Glazer had lied about his address and further request to change her estate plan to bestow a one-third of her estate upon each of the Senkbeils and the remaining one-third upon Glazer. (*Id* at 3-4.) Becker also took account of Brookhouse's March 5, and March 13, 2002, meetings with Ruffalo, the dialogs of those meetings, and Brookhouse's observations about Ruffalo at those meetings. (*Id*. at 4-5.)

Nelson has practiced law for 30 years, primarily in the area of estate planning and has many wealthy clients. Nelson is an adjunct professor at Marquette where he has taught the Estate Planning Workshop for over 21 years and has been a fellow of the American College of Trust and Estate Counsel for 15 years. Nelson lists ten facts that should have been important to Brookhouse as of March 2002. (Ex. 37, 2-3.) Those facts are that Glazer was Ruffalo's only child, that Ruffalo was in a nursing home, and that Ruffalo's trust had named

31

Glazer as the sole beneficiary since 1999. (*Id.*) Additionally, Brookhouse knew that Ruffalo decided to give Glazer her house and had called his office on February 27, 2002, requesting preparation of a deed to accomplish that gift. (*Id.*) Nelson also cited Brookhouse's knowledge that Richardson met with Ruffalo at the nursing home on February 28, 2002, and Ruffalo signed the deed at that meeting. (*Id.*) Brookhouse also knew that a question about whether Glazer lived in Roseville or Granite Bay, California arose in conjunction with the Wisconsin real estate transfer return associated with that deed. Also important was Brookhouse's knowledge that on March 1, 2002, Ruffalo had called Richardson, accused Glazer of lying because he lived in Roseville, not Granite Bay, and stated that she did not want the deed recorded because Glazer was lying. She now wanted her estate plan changed to give two-thirds of her assets to the Senkbeils and to reduce Glazer's share from 100 percent of her estate to one-third. (*Id.*) Additionally important, according to Nelson, was Brookhouse's knowledge that on March 4, 2002, in the opinion of Shah and Feldy, Ruffalo was mentally incompetent. Further, Brookhouse knew that on March 5, or March 13, 2002, Ruffalo was accusing Glazer of going into her home and taking her purse to California. (*Id.* at 3.)

        Also of note, according to Nelson, was Brookhouse's 12 minute conversation with Ruffalo on March 4, 2002, Brookhouse's 45 minute meeting with her on March 5, 2002, and Brookhouse's 36 minute meeting with Ruffalo on March 13, 2002. (*Id.*) Based on those facts, Nelson opined that the amount of time spent by Brookhouse was not sufficient for a reasonably prudent lawyer to determine that Ruffalo had testamentary capacity to amend her Trust. (*Id.*) Nelson also noted that after receiving the phone calls from Glazer and Feldy

about Ruffalo's incapacity, Brookhouse did not attempt to do any investigation into the state of Ruffalo's health or the medications that she was taking. (*Id.*)

Nelson also observed that Brookhouse's file notes do not indicate that he asked the necessary questions or took the necessary action that a reasonably prudent lawyer would have asked or taken to determine whether Ruffalo met the tests in Wisconsin for testamentary capacity. (*Id.* at 3-4.) On the other hand, Nelson opined that the information that Brookhouse did have was sufficient to cause a prudent lawyer to reasonably conclude that Ruffalo did not have the testamentary capacity to sign the Trust amendment. (*Id.* at 4.)

Nelson believes that an attorney has the obligation to satisfy oneself as to the testamentary capacity of the client, by (1) asking questions which require answers other than "yes" or "no"; (2) asking simple questions such as the date, time, have you been married, when did the client's spouse pass away, whether the client has children and, if so, their ages. Nelson also would verify that the answers are correct and complete. Nelson also takes copious notes and sometimes he tape records the conversation.

If a client is residing in a nursing home that sounds a warning bell and concerns should exist about the client's testamentary capacity. Additional warning signs are increasing age and deteriorating health. Nelson would gather information from his client's doctors and the nursing home, and examine nursing home records. If a person is willing to share information with Nelson, he will garner information from them regardless of whether laws exist against the disclosure. Nelson reasons that he does not represent the person who is sharing the information. If Nelson cannot gather enough information to satisfy himself that

a person has testamentary capacity, he would either not prepare the document or withdraw and that the same action would be required of a reasonably prudent lawyer.

Dementia is a real red flag – even more so if a medical doctor and a psychiatrist said that a client is mentally incompetent. Nelson would have gathered more information on the doctors' conclusions. Nelson believes that his duty to a client is absolute but his duty to a client who is doing things that she normally would not do puts one in a difficult situation.

Nelson believes that on March 13, 2002, Brookhouse's conduct was inconsistent with what a reasonably prudent estate planning lawyer would have done. Although there is no bright line rule about how much time Brookhouse should have spent with Ruffalo that day, Brookhouse's billing time and notes suggest that he did not spend enough time or do enough to make the decision. Nelson suggested 1.5 hours as a reasonable time for the assessment of Ruffalo's testamentary capacity. Nelson indicated that if Ruffalo had testamentary capacity despite malpractice, then there was no case.

Nelson agreed that a physician is in no better position than an attorney to determine testamentary capacity and that testamentary capacity is a subjective determination. Nelson has never drafted a will for a person who has been declared mentally incompetent and was unable to identify any questions that Brookhouse failed to ask.

In the opinion of Naughton, Ruffalo had the capacity to make important health care decisions on March 13, 2002. Naughton is board certified in family practice with an added qualification in geriatric medicine. (*See* Ex. 1016.) He specializes in geriatric, hospice, and palliative care. As support for this conclusion, Naughton indicated that a day earlier,

Glazer and Feldy had wanted to move Ruffalo, yet Ruffalo overruled that decision and was not moved because of her insistence. Naughton indicated that if Feldy thought Ruffalo was incompetent to make this type of decision, there was an activated power of attorney and Feldy would have been obligated to follow the agent, not the incompetent.

Naughton noted that Ruffalo had a serious fall in January 2002 and she was down and out for quite a while. Naughton believes that Shah correctly attributed Ruffalo's confusion to that trauma and that acute delirium can be remedied in contrast to dementia which will not get better and will get worse. Naughton indicated that Ruffalo's confusion in 2002 resolved pretty quickly and that it is possible for confusion to resolve in a couple of days. Naughton concurred with the decision of Shah and Feldy to activate Ruffalo's Durable Health Care Power of Attorney while she was hospitalized between January 19, and January 25, 2002. (Ex. 1015 at 6 [unnumbered].) Naughton believes that Ruffalo's clinical status of head contusions, acute rhabdomyolysis and dehydration were all contributing factors resulting in Ruffalo suffering from an acute confusional state (delirium) which was the premise for activation of her health care power of attorney. (*Id.*)

Naughton concludes that the nursing home records clearly indicate that Ruffalo's delirium had resolved. (*Id.*) Naughton's review of Ruffalo's nursing home records showed no indication of dementia, and that her delirium had resolved and that she was making decisions. Naughton cited Ruffalo's knowledge that she had a dental need, making an appointment, making arrangements for transportation and going there as very unusual for a person with dementia. Also a delusional person would not be allowed to make such

arrangements.  Naughton cited Ruffalo's consistency and indicated that Ruffalo had her own personal reasons for making decisions.  Naughton cited the nursing home records for March 2002 which indicate that Ruffalo was a good candidate for assisted living or perhaps independent living.  Naughton also concluded that Ruffalo was functioning on a higher level in the nursing home than most patients there.

Naughton indicated that Ruffalo's belligerent behavior is consistent with her prior diagnosis of paranoia and personality disorder.  Naughton believes that any physician would have found Ruffalo difficult to deal with, noting that a number of doctors had declined to treat her.  Naughton indicated that some mental illness does not prevent someone from having decision making ability.

Naughton concluded that there was overall improvement in Ruffalo's condition from January 2002 to March 2002, as evidenced by Ruffalo becoming more interactive.  Nursing home records show that treating health care professionals interacted with Ruffalo on a daily basis with Ruffalo acting as an active decision maker.  (*See id.* at 7 [unnumbered].) He noted that Ruffalo was permitted to accept or decline medications, meals, participation in therapies, and attempts at relocating her out of the facility.  (*See id.*)  He also noted that Ruffalo had Feldy's permission to speak to her attorney in early March 2002, and the Hospitality Manor social worker felt comfortable enough to serve as a witness to Ruffalo's amendment of her will.  Naughton never talked to Ruffalo, Feldy, or Shah.

Based upon his care of Ruffalo, Feldy opined that after January 22, 2002, Ruffalo did not have testamentary capacity.[16] (Exs. 13, 14, & 15.) On March 15, 2002, Feldy wrote that he concurred with Shah's January 22, 2002, determination that Ruffalo was incompetent and the declaration of incompetency. (Ex. 14.) On May 20, 2002, Feldy stated that it had been his opinion "for the past several months stretching back into 2001" that Ruffalo is and has been incapable of handling her personal and financial affairs and that her condition was highly unlikely to change in the future. (Ex. 15.)

Feldy opined that upon discharge from the hospital in January 2002, Ruffalo was "not competent to make any type of complex decisions." (Ex. 31 at 3.) In the months that Ruffalo was at the nursing home, Feldy observed that Ruffalo had "some ups and downs in her clinical course, but in general, the course was downhill. . . . Her mental status was worse towards the end than at the beginning. There were times when she was relatively lucid. There were times when she was not at all." (*Id.*)

---

[16]Feldy's July 16, 2006, opinion (exhibit 13), addresses each of the factors to be considered in determining testamentary capacity as set forth in *In re Estate of O'Loughlin*, 183 N.W.2d 133, 136 (Wis. 1971). Those factors are:

> The testator must have mental capacity to comprehend the nature, the extent, and the state of affairs of his property. The central idea is that the testator must have a general, meaningful understanding of the nature, state, and the scope of his property but does not need to have in his mind a detailed itemization of every asset; nor does he need to knew [sic] the exact value of his property. A perfect memory is not an element of a testamentary capacity. 1 *Page on Wills* (Bowe-Parker) p. 617, sec. 12.12. The testator must know and understand his relationship to persons who are or who might naturally or reasonably be expected to become the objects of his bounty from which he must be able to make a rational selection of his beneficiaries. He must understand the scope and general effect of the provisions of his will in relation to his legatees and devisees. Finally, the testator must be able to contemplate these elements together for a sufficient length of time, without prompting, to form a rational judgment in relation to them, the result of which is expressed in the will.

*Id.*

Feldy opined that Ruffalo did not regain competency between the time Shah saw her and the time she died. (*Id.* at 3.) In so concluding, Feldy relied upon Ruffalo's "varying mental status and her irrational behavior." (*Id.*) Feldy believes that any competent physician trained as he was trained would come to the same conclusion. (*Id.* at 4.) Feldy knows that from the time of her January 2002, discharge from the hospital until her death Ruffalo was aware of who she was, but he is uncertain whether she was aware of who her friends and family were or of the effects of the choices she made. (*Id.*)

Shah has no idea whether Ruffalo improved after she was transferred to Hospitality Manor because he did not have contact with her then. (Ex. 34 at 7.) In Shah's opinion, whether a person with paranoia would be capable of knowing what property the person owned, what kind of distribution the person would make, and whom and how and why, would depend on the degree of paranoia at that moment. (*Id.* at 9.) However, Shah explained that once a person with dementia has been declared not capable of making decisions, they cannot make any further decisions for themselves because their memory is impaired. (*Id.* at 9.)

### Analysis

In addressing Glazer's claims in this diversity action, the Court must apply Wisconsin substantive law. *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). The task of the federal court sitting in diversity is to ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be applied by that court if the present case were before it now. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630,

637 (7th Cir. 2002). In the absence of prevailing authority from the state's highest court, federal courts are to give great weight to the holdings of the state's intermediate appellate courts and to deviate from those holdings only when there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court. *See id.* "State law provides the burden of proof (more accurately, the risk of nonpersuasion) when it supplies the rule of decision." *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 59 (7th Cir. 1990) (citing *Palmer v. Hoffman*, 318 U.S. 109, 116-17(1943)*; Cities Serv. Oil Co. v. Dunlap*, 308 U.S. 208 (1939)).

*Negligence-Legal Malpractice Claim*

With respect to Glazer's first cause of action for legal malpractice based on the March 13, 2002, negligent amendment of the Trust, under Wisconsin law, the plaintiff has the burden of establishing the following elements: (1) the existence of an attorney-client relationship; (2) the acts of alleged negligence; (3) the negligence was the proximate cause of the injury; and, (4) damages. *Helmbrecht v. St. Paul Ins. Co.*, 362 N.W.2d 118, 124 (Wis. 1985) (citing *Lewandowski v. Cont'l Cas. Co.*, 276 N.W.2d 284, 287 (Wis. 1979)). The Wisconsin Supreme Court has defined the applicable duty of care as follows: "[A]n attorney is bound to exercise his best judgment in light of his education and experience, but is not held to a standard of perfection or infallibility of judgment." *Helmbrecht*, 362 N.W.2d at 128.

"There must first be a determination that the lawyer was negligent, *Lewandowski*, 88 Wis.2d at 277, 276 N.W.2d at 287, that is, whether he or she violated the duty 'to exercise a reasonable degree of professional care, skill, and knowledge,' *Peck v.*

*Meda-Care Ambulance Corp.*,156 Wis.2d 662, 669, 457 N.W.2d 538, 541 ([Wis.] Ct. App.1990)." *Cook v. Cont'l Cas. Co.*, 509 N.W.2d 100, 104-05 (Wis. Ct. App.1993). If the trier of fact determines that the lawyer fulfilled this standard of care, that ends the case. *Id.* The appropriate quantum of evidence in an ordinary civil case is "the greater weight of the credible evidence." *Nommensen v. Am. Cont'l Ins. Co.*, 629 N.W.2d 301, 305 (Wis. 2001) (medical malpractice action).

Glazer's claim for negligent amendment of the Trust rests on the attorney-client relationship between Ruffalo and Brookhouse. The greater weight of the credible evidence presented establishes that Ruffalo and Brookhouse had an attorney-client relationship as of March 2002. That relationship dated back to 1994. Brookhouse had at least nine contacts with Ruffalo prior to her execution of the March 2002, Trust amendment – of those nine contacts all but two were in person. Previously, the Court granted Glazer's motion for declaratory judgment that as a beneficiary of the pre-amendment Trust, Glazer had standing to sue under *Auric v. Cont'l Cas. Co.*, 331 N.W.2d 325, 327 (Wis. 1983), which allows a beneficiary of a will to maintain a legal malpractice action against an attorney who negligently drafts or supervises the execution of a will even though the beneficiary is not in privity with that attorney. (Decision & Order 5-7 (E.D. Wis. March 31, 2006).) Thus, Glazer has established the first element of his negligence claim.

The next question is whether Brookhouse was negligent in allowing Ruffalo to execute the March 2002, Trust amendment. That determination requires that the Court resolve the underlying question: Did Brookhouse act within the parameters of acceptable professional

conduct in concluding that Ruffalo had testamentary capacity to amend the Trust?  *See Olfe v. Gordon*, 286 N.W.2d 573, 577 (Wis. 1980).  This determination is a mixed question of law and fact, because the trier of fact is confronted with a dual problem – what, in fact, did Brookhouse do or fail to do in the particular situation, and what would a reasonable or prudent attorney have done in the same circumstance.  *Helmbrecht*, 362 N.W.2d at 128.

The Wisconsin Civil Jury Instructions set out the applicable standard of care to which an attorney must adhere.  *Cook*, 509 N.W.2d at 100, 103. "It is a lawyer's duty, in rendering legal services to a client, to exercise that degree of care, skill, and judgment which is usually exercised under like or similar circumstances by lawyers licensed to practice in this state." *See id.* at 103 (adopting Wis J I-Civil 1023.5).

Whether an attorney has breached the applicable standard of care is a question of fact to be determined by expert testimony.  *Helmbrecht*, 362 N.W.2d at 124.  Because the assessment of whether Brookhouse, in deciding Ruffalo's competence to amend the Trust, exercised the degree of care, skill, and judgment which is usually exercised under like circumstances involves specialized knowledge and experience, expert testimony is necessary.

*Id.*[17]  Therefore, the Court has considered the testimony of Nelson and Becker.  Both attorneys are well-qualified as experts in estate planning.

The Court makes the following findings relative to their testimonies.  Becker's practice and clients are more similar to Brookhouse's than Nelson's.  In forming his opinion, Nelson did not consider some critical information known to Brookhouse on March 13, 2002.  Nelson did not take into account the reasons articulated by Ruffalo for changing her estate plan and the fact that she articulated the same reasons on March 5, and March 13, 2002.  Nor did Nelson take into account Brookhouse's knowledge of the long estrangement between Ruffalo and Glazer; or the major change she made in her estate plan in May 1995, spurred by her tumultuous relationship with Glazer and capped by dissatisfaction with her California visit, which eliminated Glazer from her estate plan for four years.  Nelson also did not take into account Ruffalo's anger with Glazer about his plan to move her to a less expensive facility.  Becker's opinion took into account facts not cited by Nelson and was predicated upon a more complete set of relevant facts.  Thus, the Court relies on Becker's opinion that Brookhouse acted as a reasonably prudent attorney in concluding that Ruffalo was competent to amend her

---

[17]The question of competency is determined at the time of execution of the will.  *In re Estate of Sorensen*, 274 N.W.2d at 697.  Wisconsin's well-established standard for the testamentary capacity requires that:

> the testator have the mental capacity to comprehend the nature, extent and state of affairs of his property, an understanding of his relationship to persons who are or might naturally be expected to be the objects of his bounty and that the testator understand the scope and general effect of the provisions of his will in relation to his legatees and devisees.

*Id*. at 696 (citing *In re Estate of O'Loughlin*, 183 N.W.2d 133 (Wis. 1971); *In re Estate of Evans*, 265 N.W.2d 529, 536 (Wis. 1978)).

Trust. Brookhouse dealt with a client with whom he had an extensive history, and was intimately familiar with her up and down wishes with regard to estate planning.

Nelson's approach to the determination of competency may reflect the gold standard, but this Court is not persuaded that this sort of exhaustive inquiry or suggested length of time for assessment of Ruffalo's testamentary capacity was warranted of a reasonably prudent attorney under the facts and circumstances of this case. As the Court previously noted, Nelson's opinion did not include consideration of some relevant background knowledge possessed by Brookhouse when he made the March 13, 2002, competency determination.

Brookhouse had considerable estate planning experience and the opportunity to observe and talk to Ruffalo over the eight years he represented her. He was very mindful of his obligation to carry out Ruffalo's testamentary wishes, but only if Ruffalo was competent.

As a witness, Brookhouse was sometimes vague or tentative and had difficulty in recalling some matters, but the Court found him credible. He was attempting to be accurate in his testimony and was not prone to hasty answers.

In deciding whether Brookhouse's conclusion that Ruffalo possessed testamentary capacity was based on the degree of care, skill, and judgment which is usually exercised under like circumstances, the Court gives great weight to the solid relationship between Brookhouse and Ruffalo. Through the estate planning work Brookhouse had done for Ruffalo beginning eight years earlier in 1994, he knew of her and Glazer's long estrangement and their newly renewed and tumultuous relationship.

Brookhouse was also, as mentioned, familiar with Ruffalo's penchant for at times quickly, and perhaps impulsively, changing the beneficiaries of her estate plan when she was displeased with them. Less than a month after Ruffalo executed her first estate planning documents with Brookhouse, she contacted him requesting that her friends, the Ruffolos, be eliminated as Trust beneficiaries. An unsuccessful visit with Glazer in California, and dissatisfaction with elements of her relationship with Glazer and Diane, triggered the elimination of Glazer from Ruffalo's estate plan in May 1995, and inclusion of Pulera and his children. Later, in 1999, problems in her dealings with Pulera, lead Ruffalo to revise her estate plan to reinstate Glazer and excise any involvement of Pulera and his children in that plan.

In considering the *In re Sorensen* factors, Brookhouse discussed Ruffalo's sentiments about Glazer and the Senkbeils. Glazer was her only child. Brookhouse also discussed the division of her estate into equal thirds between Glazer and the Senkbeils. Ruffalo also answered Brookhouse's questions appropriately. That discussion of the division of her estate into equal thirds evinces Ruffalo's understanding of the scope and general effect of her Trust. Tellingly, Ruffalo rejected Brookhouse's suggestion that she deed her home to Glazer. This again supports Brookhouse's conclusion that Ruffalo understood what she was doing. Brookhouse also confirmed Ruffalo's understanding of her major assets; her home, bank account, and her annuity. While more questioning about those major assets would have given a greater understanding of Ruffalo's knowledge of the nature and extent of her property, Brookhouse and Ruffalo did talk enough over their lengthy relationship about the house,

annuity, and bank account for Brookhouse's testamentary inquiry to fall within the parameters of professional conduct.

The Court notes additional support for this conclusion. Eight days prior to the amendment, Brookhouse had met with Ruffalo and determined that she satisfied the *In re Sorensen* test for competency. Brookhouse observed that Ruffalo seemed the same on March 13, 2002, as she had been on March 5, 2002, when Ruffalo reiterated the difficulties she had with Glazer. She also had furnished Brookhouse with a detailed explanation about what other relatives might be the natural objects of her bounty, and why she chose the Senkbeils as beneficiaries of her estate. Brookhouse's determination that Ruffalo was competent to amend the Trust on March 13, 2002, was also consistent with Richardson's independent February 28, 2002, determination that Ruffalo was competent to execute the deed.

Glazer has relied upon the determinations by Shah and Feldy that Ruffalo was incompetent. However, Shah did not see Ruffalo after her January 2002, discharge from the hospital. Feldy did continue to see Ruffalo after she was in the nursing home, but Feldy has no special expertise in geriatric or mental health issues. In contrast, Naughton has considerable expertise in geriatric medicine and Naughton's expert opinion that Ruffalo had the capacity to make important health care decisions on March 13, 2002, is particularly important. Moreover, "the general mental condition of one who executes a will is only peripherally relevant, for a person may have a general or usual condition of inability to comprehend and yet have lucid intervals, during which time there is demonstrated testamentary capacity and a will may be appropriately executed." *In re Estate of Becker*, 251

Case 2:05-cv-00130-RTR    Filed 01/17/08    Page 45 of 49    Document 113

N.W.2d 431, 434 (Wis. 1977) (citations omitted). Thus, Shah and Feldy's determinations that Ruffalo was incompetent to make decisions were only peripherally relevant to Brookhouse's assessment.

Additionally, Shah and Feldy's opinions are undercut by the March 2002, Hospitality Manor nursing notes and assessments and the day-to-day observations related by Walczak. While Walczak admitted that she considers herself an advocate for patients, she was a sincere and truthful witness. Glazer's claim that Walczak was a biased witness is diminished by the fact that she identified a decline in Ruffalo's health beginning on April 8, 2002. In addition after making this observation, there is no further indication that Walczak continued her efforts to have the certificate of incompetency lifted.

Walczak's testimony disclosed Ruffalo's daily life at Hospitality Manor and Ruffalo's ability to make decisions and to express opinions. Walzcak was sufficiently impressed by Ruffalo's competence that she attempted to have the medical incompetency finding lifted during the time frame critical to this issue. A nurse apparently concurred with Walczak's assessment and aided her, albeit unsuccessfully, with that effort. Despite Feldy's unequivocal opinion that Ruffalo was incompetent, Ruffalo was allowed to execute a "do not resuscitate" directive within days of her death – long after Brookhouse's March 13, 2002, determination that Ruffalo had testamentary capacity.

Glazer also argues that Ruffalo showed signs of incompetency because the date which she advised Richardson that her house had been purchased was incorrect. This argument

is not persuasive.  The evidence does not establish the source of the mistake.  Did Ruffalo provide the wrong date or was a recording error made?

Glazer also suggests that Brookhouse should have noticed the discrepancy between the date for the purchase of her home which Ruffalo provided to Richardson and the deed in Brookhouse's file showing that the home was purchased in 1964.  Even if Ruffalo provided the wrong date on February 28, 2002, the misstatement of that date, in the context of the other evidence before the Court, is insufficient to satisfy Glazer's burden of showing that Brookhouse's assessment of Ruffalo's testamentary capacity on March 13, 2002, fell below the parameters of acceptable professional conduct.  Glazer did not present sufficient evidence to demonstrate that Brookhouse failed to exercise a reasonable degree of care, skill and knowledge in allowing Ruffalo to amend the Trust on March 13, 2002.  The failure to do so is fatal to the  claim.  *See Cook*, 509 N.W.2d  at 105.  Because Glazer has not proved his negligence claim (first cause of action), that claim is dismissed.

### Breach of Contract Claim

With respect to Glazer's second cause of action for breach of contract, the relationship of attorney and client is one of agency resting upon contract, and the rules governing contract formation determine whether such a relationship has been created.  *See Sec. Bank v. Klicker*, 418 N.W.2d 27, 30 (Wis. Ct. App. 1987).  "The contract may be express, but yet formality is not essential."  *Id.*  "[T]he relationship may be implied from the words and actions of the parties."  *Id.*  Whether an attorney-client relationship exists rests on the intent of

the parties and presents a question of fact for the fact finder. *Marten Trans. Ltd. v. Hartford Specialty Co.*, 533 N.W.2d 452, 456 (Wis. 1995).

Glazer established that Brookhouse offered to act as counsel on Glazer's behalf. Brookhouse advised Glazer that the decision was his as to whether he wanted Brookhouse to represent him. However, no evidence was presented of any words or actions by Glazer which could have indicated that he accepted Brookhouse's offer to act as his attorney. Thus, Glazer did not prove the formation of an independent attorney-client relationship between Glazer and Brookhouse. There was no acceptance of Brookhouse's offer. Therefore, when Brookhouse amended Ruffalo's Trust and will in March 2002, and presented them to her for execution, he was acting solely as Ruffalo's attorney. Without an independent attorney-client relationship with Brookhouse, Glazer cannot establish his breach of a contract claim against Brookhouse. Therefore, Glazer's breach of contract claim (second cause of action) against the Defendants is dismissed.

*Costs*

Glazer has not proved his negligence or his breach of contract claim. The Defendants have prevailed in their defense of this matter. Therefore, as the prevailing parties, the Defendants are awarded costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure. *See Rep. Tobacco Co. v. N. Atl. Trading Co., Inc.*, 481 F.3d 442, 446 (7th Cir. 2007) ("Courts and commentators have interpreted 'prevailing party' to mean 'the party in whose favor judgment has been entered.' *Moore's Federal Practice* § 54.101[3] (3d ed. 2006)").

*Conclusions of Law*

Based on the foregoing, the Court concludes as a matter of law that:

Brookhouse was not negligent when he allowed Ruffalo to amend the Trust on March 13, 2002, by changing the beneficiary designation to make Glazer an equal co-beneficiary with the Senkbeils.

Brookhouse did not enter into an independent attorney-client relationship with Glazer. Therefore, Brookhouse did not owe any duties to Glazer in that capacity.

Glazer is not entitled to recover any damages against the Defendants.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Glazer's negligence claim against the Defendants for legal malpractice arising out of the March 13, 2002, amendment of Ruffalo's Trust is **DISMISSED**;

2. Glazer's breach of contract claim against the Defendants is **DISMISSED**;

3. Pursuant to Fed. R. Civ. P. 54(d), the Defendants are **AWARDED** costs;

4. This action is **DISMISSED**; and,

5. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 17th day of January, 2008.

**BY THE COURT**

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**
